# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-745

**STATE OF LOUISIANA**

**VERSUS**

**ORLANDO DEMOND MORRIS CHARLES**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 20264-17
HONORABLE GUY E. BRADBERRY, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**JOHN E. CONERY**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John E. Conery, and Van H. Kyzar, Judges.

**CONVICTIONS AFFIRMED.
SENTENCE FOR SECOND-DEGREE KIDNAPPING VACATED.
REMANDED FOR RESENTENCING ON THE CONVICTION OF
SECOND-DEGREE KIDNAPPING AND FOR SENTENCING ON THE
CONVICTION OF FIRST-DEGREE RAPE.**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**Post Office Box 2125**
**Lafayette, Louisiana  70502**
**(337) 366-8994**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Orlando Demond Morris Charles**

**John F. DeRosier**
**District Attorney**
**Hope Buford**
**Assistant District Attorney**
**Elizabeth Brooks Hollins**
**Assistant District Attorney**
**14th Judicial District**
**Post Office Box 3206**
**Lake Charles, Louisiana  70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**CONERY, Judge.**

The State charged Defendant, Orlando Demond Morris Charles, with the first-degree rape and second-degree kidnapping of the victim following an early-morning attack that occurred at knifepoint. A jury convicted Defendant as charged. Following the imposition of sentence, Defendant appeals. For the reasons that follow, we affirm Defendant's convictions, but find it necessary to vacate the sentence imposed for second-degree kidnapping and remand for resentencing on that conviction. Finding that the trial court did not sentence Defendant on the charge of first-degree rape, we remand for sentencing on the conviction of first-degree rape.

### FACTS AND PROCEDURAL HISTORY

The State alleged that between 5:00 a.m. and 5:30 a.m. on October 23, 2017, Defendant walked up behind the victim on a public street, coerced the victim at knifepoint onto a vacant lot, and forced the victim at knifepoint to perform oral sex upon him. A nearby witness called 911, enabling the police to respond while the attack was still ongoing. Defendant ran when he saw police and was apprehended less than a block away. Within minutes of the attack, the victim positively identified Defendant as her attacker.

A grand jury charged Defendant with one count of first-degree rape, a violation of La.R.S. 14:42, and one count of second-degree kidnapping, a violation of La.R.S. 14:44.1. After a three-day jury trial beginning December 12, 2018, Defendant was found guilty of both counts. On March 19, 2019, the trial court denied a Motion for New Trial filed by Defendant. The following day the trial court discussed the appropriate sentence on the first-degree rape conviction, but failed to actually impose sentence on that charge. The trial court imposed a twenty-five year

hard labor sentence on Defendant for the second-degree kidnapping conviction but failed to specify which portion of that sentence, in whole or in part, must be served at hard labor without benefits as required by La.R.S. 14:44.1(C).

Defendant objected at sentencing and subsequently filed a Motion for Reconsideration of Sentence that was denied by the trial court without a hearing on April 29, 2019. Defendant also filed a Motion for Out-of-Time Appeal that was granted by the trial court on April 29, 2019.

Defendant assigns the following as error:

[1.]    The State failed to sufficiently prove that [Defendant] was guilty as charged.

[2.]    The trial court erred in denying the motion to suppress the suggestive out-of-court, show-up identification. The circumstances here show a substantial likelihood of misidentification. A new trial should be granted.

### LAW AND DISCUSSION

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are errors patent, which Defendant raises as his own "Error Patent 1."

Defendant contends the trial court erred by failing to impose a sentence on either count; thus, the sentences must be vacated, and the case remanded for resentencing. In particular, Defendant contends the trial court failed to actually impose a sentence for the first-degree rape conviction and failed to clearly state how much time was to be served without benefits for the second-degree kidnapping conviction. In its brief, the State acknowledges that the trial court failed to impose a sentence for the first-degree rape conviction.

2

At sentencing, the trial court stated the following:

THE COURT:

Thank you. Let the defendant rise. Let the record reflect the Court, as Defense Counsel suggested, is mandated under Louisiana law, under Louisiana R.S. 14:42, First-Degree Rape:

"Whoever commits the crime of first-degree rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence."

Again, as the defendant has learned through this trial, Mr. Charles, that Louisiana law is a solemn expression of legislative will. So, this Court is mandated under law that, if a jury of your peers or a jury chosen by the State and by counsel, has made a decision, they have decided your fate under Louisiana law.

As it relates to the second charge conviction - - that's 14:44.1, Second Degree Kidnapping, the statute reads in pertinent part:

"Whoever commits the crime of second-degree kidnapping shall be imprisoned at hard labor for not less than five nor more than forty years. At least two years of the sentence imposed shall be without benefit of parole, probation, or suspension of sentence."

The Court, having considered the matter and having followed the lead in this conviction by a jury of your peers, the Court is going to sentence Mr. Orlando Charles to 25 years at hard labor, and that sentence shall run concurrent with the life sentence imposed for first-degree rape.

This court agrees with Defendant and the State that the trial court failed to impose a sentence for first-degree rape. Thus, we remand for the trial court to impose a sentence for first-degree rape. *See, e.g., State v. Coward*, 18-951 (La.App. 3 Cir. 6/5/19) (unpublished opinion) (2019 WL 2366740). The trial court is reminded that the sentencing guidelines of La.Code Crim.P. art. 894.1 should be articulated and that if a downward departure from the mandatory life sentence is argued by Defendant, it should make such findings as may be warranted by the law and evidence. *See id.*

3

Defendant also claims that the trial court failed to state how much time is to be served without benefit of parole, probation, or suspension of sentence on the second-degree kidnapping charge. This court discussed this identical issue in the case of *State v. Ourso*, 10-1133, p. 3 (La.App. 3 Cir. 6/1/11), 67 So.3d 684, 685-86, explaining in pertinent part: "[W]here the statute gives the trial court discretion as to the number of years imposed to be served without benefits, the reviewing court should vacate the illegally lenient sentence and remand for resentencing."

Likewise, and as seen by the sentencing transcript in this case, the trial court failed to specify the amount of time Defendant's sentence for second-degree kidnapping is to be served without benefit of parole, probation, or suspension of sentence. Accordingly, we vacate the sentence imposed for the conviction of second-degree kidnapping pursuant to La.R.S. 14:44.1 and remand this matter for resentencing on that charge. The trial court is instructed to specify the amount of time to be served without benefit of parole, probation, or suspension of sentence.

*Sufficiency of the Evidence*

Defendant alleges the evidence was insufficient to prove his identity as the perpetrator of the crimes charged. In particular, he challenges the victim's in-field identification of him as her attacker as well as the reliability of DNA evidence connecting him to the attack. When the issues on appeal relate to both sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The rationale is that when the entirety of the evidence is insufficient to support a defendant's conviction, the defendant must be discharged as to that crime, and any other issues become moot. *State v. Hearold*, 603 So.2d 731 (La.1992). Accordingly, this court will first address the sufficiency of the evidence.

4

The standard of review in a case of identification is well-established:

"In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . . [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La.1984). Furthermore, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. *State v. Weary*, 03-3067 (La.4/24/06), 931 So.2d 297; *State v. Neal*, 00-0674 (La.6/29/01), 796 So.2d 649. Positive identification by only one witness is sufficient to support a conviction. *Weary*, 03-3067 at p. 18, 931 So.2d at 311; *Neal*, 00-0674 at p. 11, 796 So.2d at 658; *State v. Mussall*, 523 So.2d 1305, 1311 (La.1988). It is the factfinder who weighs the respective credibility's of the witnesses, and this court will generally not second-guess those determinations. *State v. Bright*, 98-0398, p. 22 (La.4/11/00), 776 So.2d 1134, 1147.

*State v. Hughes*, 05-992, pp. 5-6 (La. 11/29/06), 943 So.2d 1047, 1051 (alteration in original).

Testimony and Evidence Submitted at Trial by the State

The first witness to testify at trial was the witness to the attack, Deneetra Shawanna Jack. On October 23, 2017, Ms. Jack stepped out of her house at approximately 4:50 a.m. to go get doughnuts for her daughter. Ms. Jack called 911[1] when she saw something suspicious on Boston Alley,[2] across from her home. According to Ms. Jack, it was dark but the lights of a nearby funeral home were on. Ms. Jack saw a woman (identified later as the victim) walking down the street with a person (identified later as Defendant) walking behind her. Ms. Jack described the

---

[1] Two discs (State's Exhibit 1 and 2) were played for the jury in conjunction with the 911 call.

[2] This path is referred to in the record as "Boston Street," "Boston Aly," and "Boston Alley." This opinion references "Boston Alley" as the most likely correct spelling of the street in question.

suspicious person walking behind the victim as a "shadow." When Ms. Jack saw the "shadow" pull the woman by her ponytail, Ms. Jack went into her residence, called 911, and watched through a window. Ms. Jack saw a man drag the victim in front of her residence and cross the street to an open field. According to Ms. Jack, the man was wearing all black, with all but his eyes being covered by a black mask. Ms. Jack could not tell the 911 operator whether the man was black, Hispanic, or white. When she gave a statement to police, Ms. Jack stated that she thought the man was white or Hispanic. At trial, Ms. Jack described the man as tall, about 6′2″, and slender.

When asked what she saw once the pair got to the field, Ms. Jack testified: "She goes down, he's down. And I thought he was killing her, that's why I told 911 he was killing her. He gets up, pants drops, and she's still on the ground." Ms. Jack saw the man rubbing his behind and moving. Ms. Jack testified that she was able to clearly see what was happening across the street. Ms. Jack estimated that Defendant and his victim were located in the field four or five minutes before an officer arrived, at which time the **man took off running with his pants down**. When asked where the man ran, Ms. Jack testified that he ran behind some houses. Ms. Jack stated that the woman got up and went to stand by the officers.

The victim, C.C.,[3] testified next and stated that she left her house a few minutes after 5:00 a.m. on the day in question to walk to a nearby bus stop, just as she does every morning. On the morning in question, the victim was walking when someone grabbed her hair from behind. The victim "kind of turned and looked," seeing that the person's nose and mouth were covered with a black face mask.

---

[3] In accordance with La.R.S. 46:1844(W), the victim's initials are used in order to protect her identity.

According to the victim, the person told her to walk and threatened to kill her. The person forced the victim to walk to an empty lot. The victim described the events that ensued as follows:

A.   He was threatening me. He was going to kill me, beat me, and when he got me on that property I did not want to do what he wanted me to do. I told him I would give him Five Dollars ($5.00) for him to leave me alone. He wouldn't accept that. He had - - he put me down on my knees. He had his fist toward my head, and he had a knife in my neck. And he - - yeah, he said, "If you don't do it I will kill you."

Q.   And what did he want you to do?

A.   He wanted me to put his penis in my mouth. He forced it.

The victim further testified that the attacker had a "red burgundy" knife that he held to her neck. The victim was in close proximity to the attacker and described the pants he was wearing as black sweatpants. The victim testified that Defendant's nose and mouth were covered by a black mask. The only facial features visible were his eyes. The victim was able to see the attacker's skin color on his hands and told police that he was black. The victim testified that she was forced to put the attacker's penis in her mouth because he held a knife to her neck, a fist toward her head, and threatened to kill her if she did not.

The police arrived within a few minutes of the initial attack, and the man started running. The victim ran to the police and said, "black man." The victim testified that she did not know the man. According to the victim, she got into the police car and rode with the officers until they were quickly able to locate and apprehend a suspect. The police put a powerful light on a person, and the victim told the police, "That's him." When asked how she was able to identify the man as her attacker, the victim replied, "I saw his pantses [SIC]. His black pantses [SIC]

7

that he had on, the sweat looking pantses [SIC]. Black." The victim further stated that the man in police custody matched the description of Defendant she gave the officers because the man was tall and was wearing black sweatpants. When asked whether she had any doubt that the man she identified was her attacker, the victim responded that she "had no doubt at all[.]"

The victim testified that she saw no other black males in the area and that her identification of the attacker took place only a few minutes after the attack. The victim explained that she did not go to the hospital because her attacker did not cut her. The victim did, however, wash her mouth out with soap and water.

On cross-examination, the victim testified that she knew the reason she was getting into the police car was to try to identify the suspect. When asked if the police ever showed her a line-up of different people, the victim replied that they did not.

On re-direct examination, the victim was shown State Exhibit (S-5) and asked if the clothing worn by the man in the photo depicted the clothing worn by her attacker. The victim did not remember the shirt but did recognize the pants. The victim identified State Exhibit (S-6) as a knife, but did not know if it was the same knife used by her perpetrator. The victim remembered that the knife held to her neck was a "red burgundy" knife but did not see how long the blade was. She testified that the pants depicted in S-5 were the same pants worn by the person who attacked her. Finally, the State asked the victim if there was anyone else in the area that fit the description of her attacker other than the person in the spotlight. The victim replied, "It was just him, and I saw only him."

Officer John Littleton of the Lake Charles City Police Department testified that his shift started on October 23, 2017 at 5:30 in the morning. As he was

preparing to go into the police department building, he heard a dispatch call regarding a possible rape in progress a few blocks away. Due to the exigency of the situation, Officer Littleton went to the scene of the possible rape without going inside the police station to get his body camera. As he was arriving at the scene, Officer Littleton received a dispatch that the possible suspect was running eastbound. Officer Littleton spoke with the victim, who described her attacker as a tall man wearing black. While another officer stayed with the victim, Officer Littleton began his pursuit of the suspect. When asked how far he got in his pursuit, Officer Littleton answered:

> A. I made it just to the next street, which is to Franklin Street. At that time, I looked north, or to my left, and didn't observe anything. I looked to my right, which is south, and when I looked south, I observed more of our units that were going in the area. Coming north, one of those officers was Corporal Magee, and he advised me that when I was looking south he observed a subject run westbound across the street. So, they pursued that lead and ended up going out and detaining the subject.

Officer Littleton went back to the victim, who gave him more information regarding the description of the suspect. The victim told the officer that the subject was a tall male, wearing all black, and a ski type mask. The victim further stated that the subject put a knife to her throat and forced her to perform oral sex on him. Since the subject was found in close proximity to the crime and matched the description given by the victim, the subject was detained. Relaying information back and forth, the officers detaining the subject asked the victim to describe the knife that was being held to her neck. The victim stated only that the knife was burgundy. The victim further stated that she could tell the attacker was black by looking at his hands.

Officer Littleton then drove the victim in his vehicle for a short distance to the location of the suspect to see if she could identify the subject being detained as the person that attacked her. Officer Littleton explained the procedure utilized in drive-by identifications, indicating that the subject is faced in one direction, and the victim is driven by while a spotlight is shined in the subject's face. Officer Littleton told the victim that he needed to see if she could identify the subject as her attacker or not. According to Officer Littleton, he drove the victim by the subject very slowly and asked whether she could clearly see the subject. Officer Littleton testified the victim stated that she could see the person and without hesitation stated, "That's him." The victim was then taken to the police station to give a formal statement.

On cross-examination, Officer Littleton testified that the victim did say her attacker was black, but did not specify whether her attacker was light or dark-skinned and did not mention any tattoos on her attacker's face, which she had previously stated was covered by a black mask except for the eyes. Although the victim stated her attacker was wearing all black, she did not state whether her attacker's shirt was long-sleeved or short-sleeved. The victim also failed to describe the type of material of her attacker's pants and failed to state whether the pants had buttons or an elastic waistband. Officer Littleton identified Defense Exhibit A as a photograph with an accurate representation of Defendant on the morning of the incident. Officer Littleton agreed that the photo showed Defendant with tattoos on his face, particularly underneath each eye.

On re-direct, the following colloquy took place:

Q.    Officer Littleton, how far was it from your scene - - where you came into contact with the victim, how far was that

10

to where - - from where you brought her to do the identification?

A.     Maybe a block, maybe a little less.  A total of one block.

Q.     So, would you say it was close?

A.     Very.  In the immediate area.

Q.     Once you arrived on scene did you see anybody else wandering around, walking around in the area?

A.     No, ma'am.

Q.     At the time that you drove by to do the identification did you see anybody walking around in the area other than the officers and the suspect; but was there anybody else around in the area?

A.     There was [sic] no civilians or anything like that on the road, or walking around.

Corporal Tony Ryan Magee, a patrol officer with the Lake Charles City Police Department, testified that he was scheduled to start his shift on October 23, 2017 at 5:30 in the morning.  On his way to the department, Corporal Magee heard a dispatch regarding a rape in progress.  Corporal Magee decided to immediately respond to the call instead of first going to the department to pick up his body camera.  Corporal Magee and other responding officers began trying to set up a perimeter to contain the suspect.  When asked what he saw when he arrived, Corporal Magee stated that he saw a "tall black male cross [the street] from east to west running west."  According to Corporal Magee, the man was running through yards.  Corporal Magee drove his unit to Mill Street, where he re-encountered the running man.  When asked if he lost sight of him for a moment, Corporal Magee stated that he did lose sight of him because the man was running through yards.

Upon coming into contact with the man on "Mill Street and Boston Al[le]y," Corporal Magee began giving the man commands to walk toward him.  According

11

to Corporal Magee, the man was running through a business parking lot when he was stopped by police. The man walked quickly to Corporal Magee, "rambling on about someone . . . chasing him with a gun." Corporal Magee described the man as being sweaty and out of breath and did not see anyone chasing the man. Corporal Magee testified that the location at which he came into contact with the suspect was a half a block away from the victim's location when the initial call to police was made.

Not wanting to take any chances, Corporal Magee placed the man in handcuffs. The clothing worn by the man - black sweater or hoodie and dark clothing - matched the description of the suspect. When asked about what his discussion with the suspect, Officer Magee explained:

> A.     When he - - when he - - before I asked him anything he kept saying, "Someone is chasing me with a gun." And I asked him why he didn't stop any of the several officers that he passed when he was running through yards and tell them that. He said he didn't see any, which I find it odd that he didn't. He was yards away from marked police units parked on the roadway whenever I saw him running.

Corporal Magee testified that the man's name was Orlando, and the corporal identified Defendant as the man he detained on the night in question. After obtaining the man's consent, Corporal Magee began patting the man down for weapons and asked Orlando if he had any weapons. Orlando replied that he had a knife. Corporal Magee subsequently found a knife, a black Velcro mask, and a black "durag," in his possession. Corporal Magee identified S-7 as the knife found in the man's back right pocket and identified S-8 as the black face wrap and "durag" found in the man's front pocket. Corporal Magee further testified that one of the other officers asked Officer Littleton if the victim could describe the knife used by

12

her attacker. According to Corporal Magee, the victim's description of a red or burgundy knife matched the description of the knife found on Orlando's person.

Another policeman on the scene, Officer Padilla, did have a body camera and recorded the victim's identification of the suspect. After Corporal Magee identified S-9 as the body camera video footage, it was admitted into evidence and published to the jury. Corporal Magee arrested the suspect when the victim positively identified Defendant as her attacker. The suspect was taken to the hospital where an examination was performed using a SANE kit.[4] The nurse swabbed the suspect's mouth and penis and collected his underwear

On cross-examination, Corporal Magee agreed that each time he saw the suspect running, the suspect was running from east to west. Corporal Magee acknowledged that someone else stated the suspect was running eastward. When Corporal Magee saw the suspect running, the suspect was twenty to twenty-five yards away from another officer standing in the roadway. The other officer's marked unit was right next to him. Corporal Magee agreed that his narrative report stated that he observed the suspect run across the road "no more than 50 yards from a marked police unit." Finally, Corporal Magee testified that the "CAD call printout[,]"[5] introduced as Defense Exhibit B, showed the suspect spent a good two hours at the police department before he was taken to Lake Charles Memorial

---

[4] Exhibit S-10, a "Waiver of Medical Privilege," indicates that a subject undergoing the SANE examination acknowledges that "a Forensic Nurse Examiner, also known as Sexual Assault Nurse Examiner [SANE], will conduct a nursing Forensic Medical Exam for evaluation and documentation of injuries and collection of evidence." Such "consent and waiver authorizes a Forensic Medical Exam to be done, including, but not limited to an evidence collection kit, photo documentation, blood and urine samples for the purposes of DNA, drug and alcohol testing. It also authorizes the release of records, evidence and photographs taken to the appropriate law enforcement, child protection, child advocacy and prosecuting agencies."

[5] Both Officer Littleton and Corporal Magee testified without specificity as to the CAD call printout and described it generally as a dispatch log which included information transmitted over the police radio.

Hospital for the SANE exam. Corporal Magee acknowledged that this testimony was different than what he testified to on direct and acknowledged that "nobody's memory is perfect."

On re-direct examination, Corporal Magee testified that even though it was cold on the morning in question, Defendant was sweating when the corporal first came into contact with him.

Other Crimes Evidence

The State introduced other crimes evidence through the testimony of Lecia McCullough, a lieutenant with the Lake Charles Police Department. On May 19, 2006, Lieutenant McCullough was a detective with the Lake Charles Police Department and was involved in an investigation regarding the Defendant. Lieutenant McCullough described the investigation as follows:

> A. I was a detective on call. About 4:10, 4:11 that morning I got called in reference to an attempted kidnapping at 171 and Colletta in Lake Charles. I responded to the scene, met with the initial officers and the victim. At that time I spoke to the victim[.] I spoke to her. She advised that she was walking to work down 171. At the service station at 171 and Highway 90 she was approached by a black male in a blue Corsica and asked if she wanted a ride. She says, "No, I'm good with walking." So, she just kept walking. As she's walking she gets close to Colletta and 171. She hears footsteps running up behind her, at which time she was grabbed from behind.
>
> She fought with him, she looked and she seen it was the same black male that was in the blue Corsica. She tries to go for a knife - - I'm sorry, box cutter that she keeps in her pocket. As she's attempting to get it out of her pocket the black male also has a knife. They're struggling and she's able to get her box cutter out, and he knocks it out of her hand. She's struggling with him over his knife and her hand gets cut. She's able to take his knife away from him.
>
> During the struggle she's punched in the jaw by the black male. She's - - she then says she goes to cooperate with

14

him so she doesn't get stabbed. So, she's - - she won't cooperate and he's just saying "Get in my car. Get in my car." So, when she gets the knife she stabs him in the leg. She falls to the ground with his knife. He started screaming, "You stabbed me. Let me go." So, she just lays on the ground with his knife and he says, "Give me my knife. Give me my knife." She says no and she refuses to give it to him and he takes off running.

According to Lieutenant McCullough, the officers were notified by Lake Charles Memorial Hospital that a black male came in with a stab wound. Officers went to the hospital and spoke with Defendant, who claimed to not know who stabbed him. While at the hospital, the victim identified Defendant as the person who attacked her. After speaking with his mother, Defendant told the police he attacked the victim because he was hungry and on drugs.

Lieutenant McCullough identified Defendant in court as the same defendant in the 2006 attack. Finally, she testified that Defendant pled guilty to second-degree kidnapping on March 28, 2007.

Returning to the incident at issue in the present case, the next witness presented was Jeffrey Atkinson, a detective at the Lake Charles Police Department, who testified that he worked the graveyard shift on October 23, 2017 and was on duty at the time of the 911 call in this case. Detective Atkinson responded to the incident in question, first speaking with the victim and then speaking with the apprehended suspect. According to Detective Atkinson, the victim described the knife used by her attacker as having a burgundy handle. Detective Atkinson saw a burgundy-handled knife, a "durag," and "some sort of wrap" at the scene where Defendant was arrested. As noted above, Corporal Magee had also testified that he discovered a knife, "black velcro mask … and a black durag" while searching Defendant. After those objects were collected by Corporal Magee, Evidence

15

Officer Jessica Single photographed them and maintained them for purposes of preserving the chain of custody. Corporal Magee identified the objects at trial and all were placed in evidence. Those exhibits were published to the jury.

After Defendant was arrested, Detective Atkinson went to the police department and interviewed the victim and Ms. Jack, the witness who made the 911 call. Meanwhile, another officer collected DNA evidence from Defendant. A few days later, DNA evidence was collected from the victim and was subsequently admitted at trial as S-27, the results of which are discussed below.

Defendant was taken to the police station to give a recorded statement. The statement was admitted into evidence as S-26, and transcripts of the statement were published to the jury. In the statement, Defendant denied involvement in the offense and claimed that he was walking to work. In the statement, Defendant claimed that he had walked from Fifth Avenue and was on his way to his place of employment - Carboline. Although Defendant was usually given a ride from a co-worker, according to Defendant's statement, the co-worker could not give him a ride on the morning in question because the co-worker spent the night with his sister in Moss Bluff. Defendant claimed in his recorded statement that he left his house about 4:00 a.m. and that he texted his girlfriend when he crossed major intersections on his route. Defendant asserted the knife he carried on his person was for personal protection and described the knife as a red, burgundy color. According to Defendant, the wrap and "durag" he carried were to protect his hair at work, not for his face.

As for the 2006 incident, Defendant claimed in his statement that he was trying to collect money from selling drugs. Defendant denied having a knife in the 2006 incident and claimed that the victim stabbed him with her own knife.

16

After Defendant gave the police permission to search his phone in his statement, Defendant showed the police the text messages he sent his girlfriend when he crossed major intersections. Defendant agreed that the last text he sent was at 5:09 a.m. The police stated Defendant was arrested shortly after 5:26 a.m. Defendant asserted that he did not continue texting his girlfriend because he knew from her lack of response that she had fallen asleep. According to Defendant, he saw someone that could have been carrying a gun, so he ran, causing him to be breathing hard when the police stopped him. When asked why he was jumping fences and running, Defendant denied jumping any fences. Defendant also denied cutting through anyone's yard.

When the officer asked Defendant in his statement why he walked all the way from Fifth Avenue to Broad Street in one hour, but then took nineteen minutes to walk from Broad Street to Mill Street, Defendant stated that he was tired and slowed down. Defendant maintained, however, that he started sprinting when he claimed he was being followed by a person with a gun.

The text messages sent between Defendant and his girlfriend the morning of the incident were introduced at trial as S-28, S-29, and S-30, and were published to the jury.

On cross-examination, defense counsel asked Detective Atkinson if Defendant could have been perspiring because he had traveled a long distance. Detective Atkinson replied, "This is true."

On re-direct, Detective Atkinson agreed that the black Velcro mask or mouth piece showed to the jury could "very easily" cover up the nose, mouth, and chin. Detective Atkinson also agreed that when a black piece is put against another black piece, it could look like one.

DNA Evidence

Monica Quaal, the DNA Technical Leader at the Southwest Louisiana Criminalistics Laboratory, was accepted as an expert in the field of forensic DNA analysis. Ms. Quaal testified regarding the protocol used to maintain the integrity of the evidence submitted to the lab.

As to this particular case, Ms. Quaal received Defendant's SANE kit and Defendant's underwear. One of the bags received by Ms. Quaal contained "referenced buccal swabs" and penile swabs.[6] Those items were first received by the lab on October 25, 2017. According to Ms. Quaal, those items were examined between October 25 and November 1, 2017. Ms. Quaal collected swabs from the front inside area of the underwear and collected the penile and buccal swabs. Ms. Quaal explained that the buccal swabs were cheek swabs. She testified that on November 24, 2017 the lab received a pocketknife and buccal swabs from the victim. According to Ms. Quaal, Defendant's SANE kit and underwear were put into the freezer before the pocketknife and buccal swabs from the victim were received.

The State inquired as to recovery of DNA from the penile swab of Defendant. Ms. Quall responded that "it had two contributors" and that, upon the removal of Defendant's DNA, the single source remaining was that of the victim. As for the swab taken from Defendant's underwear, Ms. Quaal responded: "[T]he major contributor matched the profile - - the profile obtained from the buccal swab of [the victim], and the minor profile matched to . . . the profile obtained from the buccal swab of Orlando Charles."

---

[6] On cross-examination, Ms. Quaal explained that reference samples are the buccal swabs.

On cross-examination, Ms. Quaal testified that most of what is done in the DNA laboratory is done by robotics to prevent contamination. According to Ms. Quaal, the DNA is actually extracted using a robot. Ms. Quaal also testified that no contamination was found in this case. According to Ms. Quaal, the lab is audited externally every two years and internally a minimum of every two years to help combat contamination. Ms. Quaal testified that the lab workers change their gloves often, decontaminate with bleach, and use sterilized tools. Because Ms. Quaal's lab does not collect samples from the crime scene, Ms. Quaal could not testify as to the safety protocols used by the agency collecting such samples:

> A.    I can only discuss from when it comes in the lab. Like I said, we make sure there's a seal on it. We make sure that there's no way for it to be contaminated once it comes into the laboratory. Crime scene collection, decontamination, you'd have to ask the agency.

When asked what would happen if a person failed to change gloves between handling items, Ms. Quaal answered that the DNA from one item could be transferred to the next, but she is the only person that "did DNA on this case." Ms. Quaal testified that she uses a computer program to calculate how the probability numbers are generated.

On re-direct, Ms. Quaal and the State had the following colloquy as to why there was no reason to believe any contamination took place in the present case:

> Q.    And the - - the contamination logs that Mr. Alexander showed you and that we put in, those come out because you get you some type of abnormal result, correct?
>
> A.    Yes, ma'am. That's - - so as soon - - like I said, as soon as we see something that's not what we're expecting, a - - if there's a peak in the blank, if there's another peak in - - in something that shouldn't be, we're going to stop and troubleshoot. And as soon as something like that happens, we write it up. We're not going to try to, you know, hide it from anybody. It's there. You - - you can

19

go - - you will go look at it, and - - and we explain exactly how we can troubleshoot it to try and figure out what might have happened and how we figured that out. So that's written on each time that's happened.

Q. Did that happen in this case?

A. No, ma'am.

Q. And if it had happened, you would have noted it, correct?

A. Yes, ma'am. There would have been something in the case file. I - - I reviewed, just to prepare for court. I reviewed the blanks again. Like I said, at - - there was no - - nothing. There was no peak in amplification either. So we have no reason to believe there was any type of contamination.

The State rested its case after all of its evidence was published to the jury.

Testimony and Evidence Submitted at Trial by Defendant

Defendant first presented the testimony of his co-worker at Carboline, Phillip Chretien. Mr. Chretien testified that industrial paint is made at Carboline, so the workers wear protective clothing and gloves. Some workers wear a protective covering or "do-rag" over their hair. Mr. Chretien said that he usually gave Defendant a ride to work, but he called Defendant the Sunday night before to let him know that he would not be picking him up the next day, the morning in question.

Peterina Porter, Defendant's girlfriend, also testified, explaining that Defendant worked at Carboline and usually caught a ride with "Mr. Phillip." Ms. Porter testified that on the morning of the incident, Defendant left for work at 4:00 or 4:05 a.m. Ms. Porter and Defendant communicated by text after he left because Defendant always let her know where he was. Ms. Porter explained that Defendant did not want anyone to accuse him of wrongdoing or of being somewhere he should not be. Finally, Ms. Porter testified that Defendant did not care for oral intercourse.

On cross-examination, Ms. Porter testified that she gave Defendant her knife, which had a burgundy handle.

Defendant was then questioned by the court outside the presence of the jury as to his right to testify or not, and Defendant chose not to testify. After the remaining evidence was published to the jury, the defense rested its case. After being properly charged by the trial court, the jury began deliberations and eventually returned a unanimous verdict of guilty of both first-degree rape and second-degree kidnapping.

Defendant's Argument Regarding Sufficiency of the Evidence

Defendant concedes that the victim was raped in a field and taken there against her will. Defense counsel asserts, however, that the evidence was not sufficient to prove he committed these crimes, arguing to the jury in his closing remarks:

> The identification of Orlando as the perpetrator was circumstantial at best. No one, including C.C., saw the perpetrator's face. The eyewitness who called 911 admitted she could not see the perpetrator's face because of the distance and it being dark outside. There were various descriptions of a "piece" or "mask" being worn that covered his face, excluding the eyes. No distinguishing scars or tattoos were seen, especially considering Orlando has tattoos on his face. No "particular description of the clothing" was given to police, other than "black." The assailant was not caught in the act[;] he fled when police arrived. The DNA evidence is inherently circumstantial as there are margins of error and not absolute certainties when dealing with statistical probabilities. Further, Orlando never admitted to committing the crime or even having consensual sex with C.C. Thus, the identification of the suspect was circumstantial.

Defendant now contends on appeal that the victim's identification of him as her attacker did not exclude every reasonable hypothesis of innocence since the victim identified him based on his sweatpants, an item of clothing that is worn by many people and is not unique to Defendant. The knife, Defendant argues, also

failed to exclude every reasonable hypothesis of innocence since it was reasonable for Defendant to be carrying a weapon for personal protection while walking through a rough area of Lake Charles at 5:00 a.m. Because Defendant was a convicted felon, he was prohibited from carrying a gun. Finally, Defendant refutes the significance of the State's DNA evidence, asserting that contamination of the swabs cannot be excluded. Defendant contends that the evidence, rather than demonstrating his guilt, shows that he was merely on his way to work when he was stopped by police.

State's Argument Regarding Sufficiency of the Evidence

The State argues in its reply brief that the evidence clearly showed that Defendant was the person who grabbed the victim from behind, pulled her by the hair into a field, pushed her to the ground, held a knife to her throat, and forced her to perform oral sex on him. The victim identified Defendant by the pants he was wearing, his height, the face mask he was wearing, the color of his skin on his hands, and the color of the handle of the knife he was carrying. The victim's DNA was found on Defendant's penis and underwear.

Discussion and Analysis

As noted above, when the sole issue is a defendant's identity as the perpetrator rather than whether the offense was committed, "the State is required to negate any reasonable probability of misidentification." *Hughes*, 943 So.2d at 1051. "Positive identification by only one witness is sufficient to support a conviction." *Id.*

Given that standard, it is clear that the State presented evidence negating any reasonable probability of misidentification of Defendant. The police were immediately summoned to the scene by the eyewitness, who called 911 to report

22

the incident as it was happening. Upon their arrival just minutes after the 911 call, officers gave immediate chase to a suspect and Defendant was spotted less than a block away, running through yards. When he was apprehended, he was out of breath, sweating, and claimed that someone with a gun was chasing him. No one else, however, was seen in the vicinity. The victim said her attacker was a tall black male, wearing a black piece over his nose and mouth, wearing black sweatpants, and carrying a "red burgundy" knife. When Defendant was stopped, it was noted that he was a tall black male, he was wearing black sweatpants, and he was carrying a knife with a burgundy handle, a black Velcro mask, and a black "durag."

In a drive-by field identification just minutes after the attack, the victim positively identified Defendant as her attacker without any hesitation. She emphatically stated at trial that she was sure of her identification. Notably, the victim's DNA was found on Defendant's underwear and penis. Finally, the jury heard evidence that Defendant committed a similar offense in 2006.

As argued by the State, the jury obviously rejected Defendant's hypothesis of innocence that he was simply walking to work when the police found him and that the DNA results were tainted by contamination. This court has stated the following regarding a jury's rejection of a defendant's hypothesis of innocence:

> With respect to a jury's rejection of a hypothesis of innocence, our supreme court in [*State v.*] *Calloway*, [07-2306 (La. 1/21/09),] 1 So.3d [417] at 422 (citations omitted), concluded:
>
>> [W]e have repeatedly cautioned that due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection

23

of due process of law." Thus, as Judge Pettigrew emphasized, when a jury reasonably and rationally rejects the exculpatory hypothesis of innocence offered by a defendant's own testimony, an appellate court's task in reviewing the sufficiency of the evidence under the Due Process Clause is at an end unless an alternative hypothesis "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.' "

The jury's decision to reject Defendant's hypothesis regarding the commission of the crime was based upon its rational credibility and evidentiary determinations. Accordingly, the jury's verdict should not be overturned. Thus, we find that the Defendant's assignment of error lacks merit.

*State v. Jackson*, 14-9, pp. 12-13 (La.App. 3 Cir. 6/18/14), 146 So.3d 631, 639, *writ denied*, 14-1544 (La. 2/27/15), 159 So.3d 1066.

Likewise, the jury's rejection of Defendant's hypothesis of innocence in the present case was based upon overwhelming evidence as to Defendant's guilt and was well within the province of the jury.

*Assignment of Error Number Two—Motion to Suppress*

Defendant asserts the trial court erred in denying his motion to suppress the allegedly suggestive "out-of-court show-up" identification of Defendant by the victim. Defendant argues the circumstances show a substantial likelihood of misidentification. Prior to trial, a hearing was held on Defendant's motion to suppress the "show-up" identification of Defendant. After hearing the testimony of Officer Littleton, the testimony of Officer Padilla, and argument by both parties, the trial court denied the motion by written order on November 15, 2018. Defendant raised the suppression issue once again in his motion for new trial. After a hearing, the trial court denied the motion for new trial as well.

24

<u>Jurisprudence—Identification</u>

In *State v. Austin*, 470 So.2d 406 (La.App. 3 Cir. 1985), this court addressed the admissibility of a one-on-one show-up identification that occurred at the sheriff's office within two-hours of the offense. Finding the identification was admissible, this court stated:

> In reviewing an identification procedure, the court must determine whether the procedure was so unnecessarily suggestive and so conducive to irreparable mistaken identification that the defendant was denied due process. *Manson v. Braithwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Bickham*, 404 So.2d 929 (La.1981). A trial judge's determination on the admissibility of an identification should be accorded great weight and should not be disturbed on appeal unless the evidence reveals an abuse of discretion. *State v. Bickham*, supra.

> The trial court must look to the totality of the circumstances surrounding the identification procedure. *State v. Smith*, 418 So.2d 515 (La.1982). While one-on-one confrontations are not favored by the law, they are permissible when justified by overall circumstances. *State v. Dunbar*, 356 So.2d 956 (La.1978). This procedure is usually employed when the suspect is apprehended within a short time after the offense and the suspect is returned to the crime scene for on-the-spot identification. Prompt in-the-field identifications, under appropriate circumstances, promote accurate identifications and expedite the release of innocent suspects. *State v. Bickham*, supra *State v. Dunbar*, supra.

> . . . .

> The Louisiana Supreme Court, in *State v. Davis*, 409 So.2d 268 (La.1982) discussing *Manson v. Braithwaite*, supra, stated:

>> " . . . reliability is the linchpin in determining the admissibility of identification testimony. The factors to be considered include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty displayed at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification the standard, after all, is that of fairness as required by the due process clause of the fourteenth amendment. In the final analysis, it must be determined whether under all the

> circumstances of a particular case there is a very substantial likelihood of irreparable misidentification."

*Id.* at 408-09.

We find no abuse of discretion in the trial judge's ruling and affirm the trial judge's decision to deny the motion to suppress and affirm Defendant's convictions of second-degree kidnapping and first-degree rape.

## DECREE

For the foregoing reasons, Defendant's convictions are affirmed. Defendant's sentence for second-degree kidnapping is vacated and the case remanded for resentencing on that charge. The trial court is also instructed to specify the amount of time that must be served without benefit of parole, probation, or suspension of sentence for the conviction of second-degree kidnapping. The trial court is further instructed to impose a sentence for Defendant's conviction of first-degree rape.

**CONVICTIONS AFFIRMED.
SENTENCE FOR SECOND-DEGREE KIDNAPPING VACATED.
REMANDED FOR RESENTENCING ON THE CONVICTION OF
SECOND-DEGREE KIDNAPPING AND FOR SENTENCING ON THE
CONVICTION OF FIRST-DEGREE RAPE**.

26